**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

EDWARD W. HENRY,

CASE NO. 16-11961

*Plaintiff*,                    DISTRICT JUDGE MARK A. GOLDSMITH
*v.*                               MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

*Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (Docs. 13, 14)**

## I.      RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports

the Commissioner's determination that Henry is not disabled. Accordingly, **IT IS**

**RECOMMENDED** that Henry's Motion for Summary Judgment, (Doc. 13), be **DENIED**,

the Commissioner's Motion, (Doc. 14), be **GRANTED**, and that this case be **AFFIRMED**.

## II.      REPORT

### A.      Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of

Reference, this case was referred to the undersigned Magistrate Judge for the purpose of

reviewing a final decision by the Commissioner of Social Security ("Commissioner")

denying Plaintiff Edward Henry's ("Henry") claim for a period of disability and Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et*

*seq.* (Doc. 2). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 14).

Henry previously filed applications for SSI and DIB on April 5, 2011, alleging a disability onset date of September 4, 2010. (Tr. 15). These claims were denied at the initial level on June 1, 2011. (*Id.*). Henry did not appeal the decision. (*Id.*).

On September 19, 2012 and October 26, 2012, Henry filed renewed applications for DIB and SSI (respectively), alleging the same disability onset date of September 4, 2010. (Tr. 151-57, 161-65). The Commissioner denied his DIB claim. (Tr. 70-80). Henry then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on September 17, 2014 before ALJ Melissa Warner. (Tr. 28-69). At the hearing, Henry—represented by his attorney, Andrea Hamm—testified, alongside a Vocational Expert ("VE"). (*Id.*). The ALJ's written decision, issued October 6, 2014, found Henry not disabled. (Tr. 15-24). On April 4, 2016, the Appeals Council denied review, (Tr. 1-6), and Henry filed for judicial review of that final decision on May 31, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.      ALJ Findings

Following the five-step sequential analysis, the ALJ found Henry not disabled under the Act. (Tr. 15-24). At Step One, the ALJ found that Henry last met the insured status requirements of the Social Security Act on December 31, 2012, and had not engaged in substantial gainful activity in the interval between his alleged onset date of September 4, 2010 and his date last insured. (Tr. 17). At Step Two, the ALJ concluded that the following impairments qualified as severe: "mild osteoarthritis of the hip," "degenerative joint disease of the spine," "obesity," and "sarcoidosis . . . ." (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 18-19). Thereafter, the ALJ found that Henry had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> [A]llowance to change positions every 30 minutes for one to two minutes in the immediate vicinity of the work station with sitting, standing or walking for a total of four hours each; no operation of foot controls; occasional climbing stairs; no climbing ladders and the like or balancing on one lower extremity at [a] time; occasional stooping greater than 90 degrees, kneeling,

or crouching; no crawling or exposure to obvious hazards; occasional exposure to temperature extremes, humidity and respiratory irritants; and no fast paced work meaning no work where the pace of productivity is dictated by an external source over which the claimant has no control such as an assembly line or conveyor belt.

(Tr. 19). At Step Four, the ALJ found Henry incapable of performing his past relevant work as a "truck driver/milk hauler," or as a "meat cutter," through his date last insured. (Tr. 22). But proceeding to Step Five, the ALJ determined that "there were jobs [through his date last insured] that existed in significant numbers in the national economy that the claimant could have performed . . . ." (*Id.*).

### E. Administrative Record

#### 1. Medical Evidence

The Court has reviewed Henry's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

##### i. Function Report

On August 31, 2012, Henry filled out a Function Report. (Tr. 184-91). Describing his conditions, he noted swelling in his lower extremities "getting worse every year," as well as cellulitus, ulcers in the left lower leg requiring "elevat[ion] 24 [hours] at a time." (Tr. 184). He spent each day "mostly . . . keeping [his] leg elevated," but he also took care of his mother, six-year old son, and pets. (Tr. 185). Due to his conditions, he suggested he could no longer work up to eight hours at a time, which he says he used to do. (*Id.*). They affected his sleep as well, causing him to "wake up 4 or 5 time[s] a night." (*Id.*). But he

reported no other issues with activities of daily living, aside from taking showers instead of baths. (*Id.*).

Henry indicated an ability to prepare bologna sandwiches daily, scrambled eggs, and chili on weekends without help. (Tr. 186). He also noted an ability to do dishes, laundry, and lawn-mowing "sometimes" for twenty minutes. (*Id.*). He left the house three or four times a day to take his dog out, but if he otherwise left to shop for groceries—which occurred twice a month—he could drive a car on his own. (Tr. 187). If he does drive, he only drives for "about 1 to 1½ [hours]" because he "cant [sic] stand sitting any longer." (*Id.*). He disclosed no difficulty paying bills, counting change, or handling a savings account, though he avoided using a checkbook so he would not have to worry about "b[o]unced checks." (*Id.*).

Under hobbies and interests, Henry listed fishing and hunting. (Tr. 188). As he indicated, "I eat a lot of fish," but "I don't [hunt] as much anymore." (*Id.*). Indeed, he wrote that he went from hunting three to four times a week to "0 times in [the] last 8 to 10 [years]." (*Id.*). No longer did he engage in social activities either. "I used to work at bingo hall 4 to 5 times a week," but "now I don't go at all." (Tr. 189). In particular, he marked difficulties with lifting, squatting, bending, standing, reaching, walking, and sitting. (*Id.*). "I have know [sic] strength or stamina to do much." (*Id.*). He could walk up to half a mile before needing to rest for up to twenty minutes, and he could pay attention for up to five minutes if something "interested" him. (*Id.*). His ability to handle stress ranged from "fair to not well," though he handled changes in routine "okay." (Tr. 190).

Henry's partner, Diana Gonzales, also filled out a Third-Party Function Report. (Tr. 192-99). Ms. Gonzales mostly reiterated items alluded to in Henry's Function Report, with some telling differences: she noted that he also shopped for clothes and "window shops" for as "long as we feel like," (Tr. 195); she indicated that Henry still hunted "[d]epend[ing] on [the] season," (Tr. 196); she suggested that he went "to grandkids' football games" on a "weekly" basis, (*Id.*); and she described his ability to handle stress or changes in routine as "good." (Tr. 198).

### ii.         Henry's Testimony at the Administrative Hearing

Henry opened his testimony by noting that his weight—three hundred and forty-seven pounds—had "been coming down" since he stopped driving a truck, which only allowed him to eat twice a day. (Tr. 36). He noted that he presently had no problem driving for short distances. (Tr. 38). Thereafter, he recounted his prior work as a long-haul truck driver and as a meat cutter. (Tr. 38-40). When asked why he stopped working between 2011 and 2012, Henry replied that the cause was "[b]asically[] the restrictions they put on my license." (Tr. 41). And when he applied to other jobs and told them "I had to be up moving so the blood can flow in and out of my legs," employers would "see the restrictions that I had" and "they wouldn't hire me." (Tr. 42). "[W]hen you got a pre-existing condition, most places won't hire you with all that." (*Id.*).

The ALJ moved on to question restrictions provided in a note Henry received, namely the need to elevate his foot on a stool for five to fifteen minutes every several hours at work. (Tr. 43-44). Henry indicated that elevating his leg "lets the blood come back out of my leg, so it doesn't sit there and pool." (Tr. 44). He claimed an ability to walk or sit for

up to forty minutes before needing to elevate his leg. (Tr. 45). However, he said that he could do a sit down job that allowed him to elevate his legs to hip level. (*Id.*).

Henry then testified to difficulty breathing, which caused him to use an inhaler about twice a day in 2012. (Tr. 46). He also noted that a fall that year "bruised [his] hip bad enough that it turned purple," and that doctors later diagnosed him with arthritis. (Tr. 47). He could only sit for about forty to forty-five minutes in a car, fifteen minutes in a steel folding chair, or twenty minutes in a padded chair as a result of this injury. (Tr. 47-48). Medications that Henry took for these conditions caused dizziness and drowsiness for about fifteen to twenty minutes once a day. (Tr. 49). He alluded to an ulcer in his ankle that caused him to stop working an old job in Indiana. (Tr. 52-53). And he described how the cellulitis in his left leg will turn "fire engine red when it's there," and that he had to stop working for a time in 2000 because "I got sick with the cellulitis infection, then I got the ulcer right behind it, . . ." (Tr. 54). He averred a loss of sensation in his feet. (Tr. 55). Of note, the U.S. Department of Veterans Affairs determined that Henry was 40% disabled. (Tr. 56). In addition to extrapolating on these issues, Henry summarized his daily activities during the 2012 period as washing dishes, preparing meals, and vacuuming. (Tr. 48).

The ALJ proceeded to ask pointed questions about references to Henry fixing up a house in the record. Henry suggested that "the insurance company" wanted "the back side of the house torn off," and "the only thing I did was bought the linoleum." (Tr. 58-59). The ALJ remained skeptical: "[W]hy would the records say that you're working on fixing up a house?" (Tr. 59). Henry replied, "I'm just buying materials is all. I have never put linoleum down so I don't . . . [know] how to cut or anything." (*Id.*).

9

### iii.        The VE's Testimony at the Administrative Hearing

The VE began by adjusting his vocational summary to include "meat cutter" and "[truck driver/]milk hauler" as past relevant work. (Tr. 60-61). The ALJ then posed a hypothetical individual who "can perform all the functions of light work, except allowed to change position every 30 minutes for one to two minutes in the immediate vicinity of the work station, with sitting, standing, or walking for a total of four hours each in a work day. No operation of foot controls. No balancing on one lower extremity at a time. Occasional climbing of stairs. No climbing ladders and the like. Occasional kneeling, crouching, or stooping greater than 90 degrees. No crawling or exposure to obvious hazards. And no fast paced work, meaning no work where the pace of productivity is dictated by an external source over which the individual has no control, such as an assembly line or conveyer belt. Would such a person be able to perform the claimant's past relevant work?" (Tr. 61-62). The VE indicated that such an individual could not perform any of Henry's past work. (Tr. 62). However, such individual could be a "photocopy machine operator"—with 1,500 to 2,000 local job availabilities and 135,000 national job availabilities—a "hand packager"—with 1,500 local job availabilities and 30,000 to 40,000 national job availabilities—a "furniture rental consultant"—with 1,500 to 2,000 local job availabilities and 100,000 national job availabilities. (Tr. 62-63). Asked if this assessment might change upon adding "occasional exposure to temperature extremes, humidity, and respiratory irritants" to the calculation, the VE denied that it would. (Tr. 63). Further, adding a limitation that "while seated, the individual needed to elevate the leg, one leg for five to 15 minutes every two to three hours," the VE indicated that "elevation beyond 10

to 12 inches is not permissible in the work place, . . ." (Tr. 64). If, however, the individual

only needed to elevate at "eight to 12 inches," then competitive employment existed as a

"document preparer"—with 10,000 to 14,000 local availabilities and at least 350,000

national job availabilities—a "telephone quotation clerk"—with 1,000 to 2,000 local job

availabilities and at least 126,000 national job availabilities—a "surveillance monitor"—

with 4,000 local job availabilities and at least 125,000 national job availabilities. (Tr. 65-

66). The VE went on to clarify that "one is required to be on task a minimum . . . of at least

80 percent throughout the work day, and that's inclusive of the generally prescribed

breaks." (Tr. 67). Elevation of the legs is permitted on breaks. (Tr. 68).

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability

decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various

categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513.

"Acceptable medical sources" include, among others, licensed physicians and licensed or

certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who

are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.*

§ 404.1513(d). Only "acceptable medical sources" can establish the existence of an

impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both    "acceptable"

and non-acceptable sources provide evidence to the Commissioner, often in the form of

opinions "about the nature and severity of an individual's impairment(s), including

symptoms, diagnosis and prognosis, what the individual can still do despite the

11

impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved

to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).

13

Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

14

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication .
        . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027,

1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore,

the claimant's work history and the consistency of his or her subjective statements are also

relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the

groundwork for this, stating, "An individual shall not be considered to be under a disability

unless he [or she] furnishes such medical and other evidence of the existence thereof as the

Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5.

The RFC "is the most he [or she] can still do despite his [or her] limitations," and is

measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

A hypothetical question to the VE is valid if it includes all credible limitations developed

prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.

1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D.

Mich. Dec. 9, 2009).

In the Sixth Circuit, a prior decision by the Commissioner can preclude litigation in

subsequent cases.

When adjudicating a subsequent disability claim with an unadjudicated period
arising under the same title of the Act as the prior claim, adjudicators must
adopt such a finding from the final decision by an ALJ or the Appeals Council

15

> on the prior claim in determining whether the claimant is disabled with respect
> to the unadjudicated period unless there is new and material evidence relating
> to such a finding or there has been a change in the law, regulations or rulings
> affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126

F.3d 837 (6th Cir. 1997)). The applicable regulations explicitly invoke *res judicata*: An

ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final]

determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957,

416.1457. Ultimately, the *res judicata* effect of past ALJ decisions is actually a form of

collateral estoppel precluding reconsideration of discrete factual findings and issues. *See*

*Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply

collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that

have already been decided by a prior ALJ when there are no changed circumstances

requiring review.").

In *Drummond*, the Sixth Circuit held that the first ALJ's RFC applied to a

subsequent period unless the circumstances had changed. 126 F.3d at 843. The court later

reaffirmed this principle in *Haun v. Commissioner of Social Security*, rejecting the

argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated

period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004). The

Commissioner's internal guide explains the different issues and factual findings precluded

by *res judicata* under *Drummond*. *See generally Soc. Sec. Admin., Hearings, Appeals, and*

*Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-*9 (Dec. 30, 1999). These

include the RFC and various other findings along the sequential evaluation process, such

16

as "whether a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*[1]

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No. 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof of changed circumstances. Thus, as applied in this Circuit, SSAR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding.

To overcome this presumption, the Sixth Circuit has consistently anchored the analysis on the comparison between the "circumstances existing at the time of the prior decision and the circumstances existing at the time of review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). The court explained in a case predating *Drummond*:

---

[1] Tension exists in the case law addressing whether *res judicata* applies to pre-hearing determinations. *Compare Wilson v. Califano*, 580 F.2d 208, 211 (6th Cir. 1978) (noting that *res judicata* can apply even where "no oral hearing was held before an ALJ on the prior application"), *with Asbury v. Comm'r of Soc. Sec.*, 83 F. App'x 682, 684 n.1 (6th Cir. 2003) ("We recognize that the applicability of the *Drummond* analysis is not clear with respect to administrative decisions that do not follow 'trial-type' hearings."). This heretofore unresolved issue can generate difficult questions, and courts typically will not address it unless raised and argued by the parties to a case. *See, e.g., Johnson v. Comm'r of Soc. Sec.*, No. 13-CV-14797, 2015 WL 730094, at *3 n.2 (E.D. Mich. Feb. 19, 2015) (declining to address the doctrine's applicability to an initial determination in light of "the tensions in the case law and the parties' failure to raise the argument").

"[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-1233 (6th Cir. 1993). The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration.[2] *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988, at *2, *8-*9. The relevant change in circumstances is not a change in the availability of evidence but a change in the plaintiff's condition.

*Res judicata* is not a complete bar on reconsidering prior decisions or determinations: the regulations provide two mechanisms for such reexamination that escape the doctrine's effects. *Purter v. Heckler*, 771 F.2d 682, 691-93 (3d Cir. 1985)

---

[2] I note, as well, that an equally important corollary to this principle dictates that an ALJ may not find *improvement* in a claimant's condition absent new and material evidence thereof following an already adjudicated period. *See, e.g., Albanna v. Comm'r of Soc. Sec.*, 2016 WL 7238925, at *15 (E.D. Mich. Nov. 22, 2016) (finding an ALJ erred by calling the claimant's illiteracy into question based on "thinly substantiated doubts" where a prior decision found him illiterate); *see also Drummond*, 126 F.3d at 842-43; *Hamblin v. Apfel*, 7 F. App'x 449, 451 (6th Cir. 2001).

(discussing reopening as an exception to claim preclusion). The first, less important to *res judicata* case law, occurs just after the initial determination when the claimant's first step in the review process is sometimes a request for "reconsideration" of that decision. 20 C.F.R. §§ 404.907, 416.1407. The more critical and complicated mechanism is reopening a prior ALJ decision.

The regulations pertaining to reopening permit the Commissioner, through an ALJ or Appeals Council, to peel back the determination or decision and revise it. 20 C.F.R. §§ 404.987, 404.992, 416.1487, 416.1492. Either the claimant or the Commissioner can initiate the process. *Id.* A determination or decision may be reopened "for any reason" within twelve months of the notice of the initial determination, but "good cause" must exist if the reopening occurs within two years of the initial determination for SSI claims, or four years for DIB claims. *Id.* §§ 404.988, 416.1488. Good cause exists if, among other reasons, "[n]ew and material evidence is furnished" for either type of claim, SSI or DIB. *Id.* §§ 404.989, 416.1489. If a determination or decision is reopened properly, *res judicata* does not apply. *Kaszer v. Massanari*, 40 F. App'x 686, 690 (3d Cir. 2002).

The decision whether to reopen, unless it implicates a colorable constitutional issue, evades judicial review: courts can only review the Commissioner's final decisions made after a hearing. *See* 42 U.S.C. § 405(g); *Califano v. Sanders*, 430 U.S. 99, 108-09 (1977). Courts may, however, review a decision *not* to reopen a case in order "to determine whether *res judicata* has been properly applied to bar the pending claim or whether, even though *res judicata* might properly have been applied, the prior claim has nevertheless been reopened." *Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999); *see also Kaszer*, 40 F. App'x

19

at 690 ("'[W]e will examine the record to determine whether or not a reopening has occurred.'" (quoting *Coup v. Heckler*, 834 F.2d 313, 317 (3d Cir. 1987))).

Implicit reopenings occur, with unfortunate frequency, where the ALJ crafts a decision that appears to "readjudicat[e] part of the period already adjudicated by the first decision" rather than "adjudicate only the subsequent period." *Gay v. Comm'r of Soc. Sec.*, 520 F. App'x 354, 358 (6th Cir. 2013). Such a reopening occurs where the ALJ reviews the entire record, including portions from the already adjudicated period, and decides "the merits of the claim." *Tobak*, 195 F.3d at 186. One factor that could lead to finding an implicit reopening is the ALJ's failure to discuss the prior determination or the *res judicata* doctrine. *See Martin v. Comm'r of Soc. Sec.*, 82 F. App'x 453, 455 (6th Cir. 2003); *Crady v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 620 (6th Cir. 1987). Nonetheless, an ALJ's review of old or new evidence does not necessarily signify a constructive reopening, for such a review would be required to decide against reopening as well as for it. *See Girard v. Chater*, 918 F. Supp. 42, 44-45 (D.R.I. 1996). The ALJ's discussion of new evidence likewise might relate to her independent determination of whether to grant benefits in the unadjudicated period, again indicating no reopening occurred. *See id.* at 44.

The ability to reopen—explicitly or implicitly—must meet certain regulatory requirements. 20 C.F.R. §§ 404.987-404.996, 416.1487-416.1494. Chief among these is the two year (SSI) and four year (DIB) time limits for good cause reopenings. *Id.* §§ 404.988, 416.1488. Consequently, an ALJ is powerless to reopen a claim outside these periods. *See Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 315 (6th Cir. 2004) ("Because

more than four years had passed since the denial of the original application, the Commissioner could not have constructively reopened Glazer's case.").

### G.    Analysis

As an initial matter, the ALJ regarded the Commissioner's prior pre-hearing determination as to Henry's disability binding, declined to reopen it, and made a decision as to only the time period from "June 2, 2011, the date after the determination through and until the claimant's date last insured." (Tr. 15). No parties take issue with this, and for this reason I assume such treatment was not error. *Accord Johnson*, 2015 WL 730094, at *3 n.2.

Henry puts forth five general arguments in his brief: (1) the RFC is faulty because the record contains no consistent RFC assessment from a medical source; (2) the RFC is conclusory and without supporting rationale or reference to the evidence, in violation of SSR 96-8p; (3) the ALJ erred in failing to reach out to Henry's treating provider as 20 C.F.R. § 404.1512(e) requires; (4) the ALJ erred in finding Henry's alleged ulcers and cellulitis non-severe; and (5) the ALJ's credibility analysis violated 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). I consider each argument in turn.

### 1.    The RFC Assessment Need Not Conform Precisely to an RFC Assessment from a Medical Source

Henry first contends that the ALJ's RFC analysis does not reflect any RFC "from a physician . . . in the record." (Doc. 13 at ID 1096). "It is clear that the ALJ erred where no support for his RFC can be found in the record." (Doc. 13 at ID 1097). To this, the Commissioner notes that Henry's position is not only incorrect—as the record contains an

RFC assessment from Dr. Abbasi—but also baseless and "rejected by numerous judges in this district, including the judges assigned to this case." (Doc. 14 at ID 1120-21) (internal citation omitted).

"An ALJ has no obligation to conform his RFC finding to a physician's RFC assessment; as the Sixth Circuit has repeatedly noted, such a requirement 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Wagner v. Comm'r of Soc. Sec.*, No. 15-11553, 2016 WL 1729553, at *12 (E.D. Mich. Mar. 22, 2016) (quoting *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)). Henry's objection, therefore, cannot prevail on its own. He must demonstrate, instead, that the ALJ failed to rely on substantial evidence. *Accord id.* ("Instead, the ALJ's RFC finding must be supported by substantial evidence, and thus must be consistent with the record as a whole."); *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 670 (6th Cir. 2009); *see also* SSR 96-5p, 1996 WL 374183, at *4 (July 2, 1996) ("Even though the adjudicator's RFC assessment may adopt the opinions in a medical source statement, they are not the same thing: A medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)."). As I discuss at length below, Henry cannot surpass this hurdle.

## 2. The RFC Assessment Is Not Conclusory

Elaborating upon the prior argument, perhaps, Henry suggests that the ALJ did not "include a narrative discussion describing how the evidence supports each conclusion, citing medical facts." (Doc. 13 at ID 1098). Ultimately, Henry avers that this omission contravened SSR 96-8p, which requires a "'function-by-function' assessment concerning [his] ability to sit, stand, walk, lift, carry, push and pull." (*Id.*) (quoting SSR 96-8p, 1996 WL 374184, at *3-*4 (July 2, 1996)). "To the contrary," offers the Commissioner, "the ALJ expressly considered the course of treatment, objective medical findings, medical opinions, and [Henry's] activities and statements about the nature and severity of his impairments, . . ." (Doc. 14 at ID 1122-23).

An overview of the ALJ's explanation following her RFC assessment tends to validate the Commissioner's argument. Defending her findings, the ALJ granted opinions from Dr. Abbasi and Dr. Aprahamian great weight, (Tr. 21-22), and Dr. O'Brien's opinion little weight, (Tr. 21). She noted that Dr. O'Brien's opinion lacked credibility because there was "no evidence that [it] was the physician's own medically based opinion," especially considering evidence that "the motives behind the issuance of the opinion [were] questionable." (*Id.*). Indeed, Dr. O'Brien stated flatly that after reviewing Henry's restrictions with him, "he finally says that he is going to do what his buddy told him – go ahead and fork out the cash and go to a private doctor, because you can get 'a much better note' that way." (Tr. 285). The ALJ was entitled to discount the limitations in that report. *Cf. Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 630 (6th Cir. 2016) ("The ALJ also

23

properly discounted [the physician's] opinion because it relied heavily on [the claimant's] self-reporting, . . . [which] signal[ed] unreliability.").

The ALJ assigned "great weight" to Dr. Abbasi because "findings of fact made by State agency medical professional[s] regarding the nature and severity of an individual's impairments are granted probative weight as expert opinion evidence by a non-examining source." (Tr. 22). In many respects, the ALJ's RFC conforms to recommendations made in Dr. Abbasi's report. *Compare* (Tr. 19) (ALJ recommending occasional climbing stairs, stooping, kneeling, and crouching), *with* (Tr. 75) (Dr. Abbasi recommending the same). But where the RFC differs, it prescribes more stringent limitations than those in Dr. Abbasi's estimation. *Compare* (Tr. 19) (ALJ recommending no climbing ladders and the like or balancing on one lower extremity, and no crawling or exposure to obvious hazards), *with* (Tr. 75) (Dr. Abbasi recommending occasional climbing ladders, ropes, and scaffolds, as well as occasional balancing and crawling, with no environmental limitations). And with respect to Dr. Aprahamian, the ALJ noted that his assessment "was based upon a thorough examination of [Henry] by a treatment provider who had complete and unfettered access to all of [his] medical history and treatment records, and was also based upon a thorough examination of the claimant . . . ." (Tr. 21). Dr. Aprahamian found Henry "able to perform physical and sedentary jobs"; his opinion was given great weight. (Tr. 309). The remainder of the record provides substantial evidence for the ALJ's RFC, which correlates closely to materials in the record, as well as to these doctors' opinions. *Compare* (Tr. 19) (the RFC), *with* (Tr. 42) (agreeing that a job "done in a seated position, where you could sit or stand . . . every half an hour" would "have been fine"), *and* (Tr. 55) (describing a loss of sensitivity

24

in Henry's feet), *and* (Tr. 190) (noting that Henry handles stress "fair to not well"). The ALJ's findings were supported by substantial evidence and Henry should not prevail on this argument.

### 3.   The ALJ Held No Duty To Re-Contact Henry's Treating Physician

Citing 20 C.F.R. §§ 404.1512(e) and 416.912(e)—which provided that an ALJ "will seek additional evidence or clarification from [a claimant's] medical source when the report from [her] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques"—Henry contends the ALJ erred in not re-contacting Dr. O'Brien. (Doc. 13 at ID 1098-1101). "[T]he ALJ had an obligation due to the fact the medical evidence contained a conflict or ambiguity that must be resolved to contact Dr. O'Brien and determine whether his restrictions outlining [Henry's] need to elevate his feet off the ground to the height of approximately a typical stool while he is seated and that he should do this for every 5-15 minutes every two to three hours is substantial in determining [his] ability to perform substantial gainful activity and at what exertional level." (Doc. 13 at ID 1101). The Commissioner, in response, notes that 20 C.F.R. §§ 404.1512(e) and 416.912(e) no longer exist, and in their place stands "a more discretionary re-contact provision at 20 C.F.R. § 404.1520b." (Doc. 14 at ID 1125).

Presently applicable regulations oblige the ALJ to "consider the relevant evidence and see if [she] can determine whether [a claimant is] disabled based on the evidence [she has]," but allows an ALJ to "recontact [a claimant's] medical source" if "the evidence is

consistent but" the ALJ either has "insufficient evidence to determine" the issue of disability or "cannot reach a conclusion" after considering the evidence of record. 20 C.F.R. § 404.1520b(b)(1)-(2)(i). I discussed at length above that the ALJ's findings rest on substantial evidence. Henry cannot, therefore, show that the ALJ had insufficient evidence to reach a conclusion. For this reason, the Court should discount Henry's objection on this ground.

### 4. The ALJ Did Not Err at Step Two of Her Analysis

Henry supposes that the ALJ's failure to find his ulcers and cellulitis "severe" at Step Two of the analysis mandates remand. (Doc. 13 at ID 1103). "[T]he ALJ not only failed in determining that his recurrent cellulitis and ulcers have been occurring for greater than 12 months but also failed to consider his non-severe medical condition pursuant to SSR 96-8p." (Doc. 13 at ID 1103). This claim fails on the merits as well. So long as the ALJ considers a claimant's "severe and nonsevere impairments in the remaining steps of the sequential analysis[,] [t]he fact that some of [her] impairments were not deemed to be severe at step two is . . . legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). The ALJ in this case considered both severe and nonsevere (*i.e.*, ulcers and cellulitis) impairments in her ultimate analysis—*see, e.g.*, (Tr. 19, 22) (noting that Henry admitted to being able to drive up to sixty miles without difficulty, unimpeded by alleged ulcers and cellulitis); (Tr. 20) ("[Henry] admitted he has not had a leg ulcer 'in years' because he is no longer sitting, or standing, 'all the time.'"); (*Id.*) ("[Henry] also was hospitalized for treatment of a transient cellulitis/sepsis infection . . . [which] resolved in a short period of time."); *see also* (Tr. 328) (noting that left leg cellulitis was "now

26

resolved"); (Tr. 608) ("Last [cellulitis] episode 5 years ago[.]")—and this Court cannot impute error to her decision to find certain impairments nonsevere at Step Two. This argument, too, should fail.

**5. The ALJ's Credibility Analysis Abides By §§ 404.1529(c)(3) and 416.929(c)(3)**

Henry's final argument postulates that because "the ALJ failed to properly evaluate [his] medical documentation as a whole," and specifically those "medical records document[ing] consistent complaints of pain and symptoms regarding his lower left extremity," the ALJ violated 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). (Doc. 13 at ID 1105). The Commissioner suggests that this Court should find Henry's argument waived as undeveloped, or alternatively affirm the ALJ's credibility assessment. (Doc. 14 at ID 1130-31).

The notion that the ALJ simply "failed to consider" the required factors rings hollow when juxtaposed with the ALJ's thorough evaluation of Henry's statements and the medical record. (Doc. 13 at ID 1106). She did not merely "suspect[] that [Henry] talked his doctor into writing . . . notes to take him off work as a truck driver," (*id.*), as Henry suggests—rather, she cited *Henry's own statement in Dr. O'Brien's note* as fomenting this suspicion, and reasonably so. *See* (Tr. 285) (exaggerating cellulitis symptoms and indicating he would "go ahead and fork out the cash and go to a private doctor, because you can get 'a much better note' that way"). The ALJ plainly considered, as well, evidence of Henry's alleged ulcers and cellulitis, as discussed in more detail above. *See generally* (Tr. 19-22). The credibility determination at issue, therefore, "may not [be] disturb[ed]

absent compelling reason," and "[n]o such reason exists here." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001); *see Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) ("This Court may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").

### H.      Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Henry's Motion for Summary Judgment, (Doc. 13), be **DENIED**, the Commissioner's Motion, (Doc. 14), be **GRANTED**, and that this case be **AFFIRMED**.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  April 12, 2017

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 12, 2017

By s/Kristen Castaneda
Case Manager